896 F. Supp. 1240

CPC INTERNATIONAL, INC., PLAINTIFF *v.* UNITED STATES, DEFENDANT

Court No. 95–02–00144

(Dated July 24, 1995)

*Neville, Peterson & Williams (John M. Peterson* and *George W. Thompson,* Esqs.), for plaintiff.
*Frank W. Hunger,* Assistant Attorney General; *David M. Cohen,* Director, Commercial Litigation Branch; *Jeanne E. Davidson,* Assistant Director *(Rhonda K. Schnare,* Trial Attorney), Civil Division, U.S. Department of Justice, for defendant.

## OPINION AND ORDER

### BACKGROUND

NEWMAN, *Senior Judge:* CPC International Inc. ("CPC") seeks preimportation judicial review pursuant to the court's jurisdiction under 28 U.S.C. § 1581(h). At issue is Customs Headquarters Ruling Letter 557994 of October 25, 1994 ("HRL"), which ruled that CPC's retail containers of finished peanut butter manufactured in the United States in part from Canadian peanut slurry must be marked to disclose that Canada is the country of origin, *i.e.,* "Product of Canada." On February 8, 1995, slightly over three months after the ruling, CPC filed this lawsuit seeking a declaratory judgment that the HRL is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.

Defendant moves to dismiss in accordance with CIT Rule 12(b)(1), claiming the court lacks jurisdiction under § 1581(h) since plaintiff has failed to demonstrate it would be irreparably harmed if preimportation review were denied. Therefore, argues the government, prior to judicial review plaintiff must first exhaust its administrative remedy by following the normal protest channels of review under 19 U.S.C. § 1514(a).

Plaintiff counters that should the court determine that § 1581(h) does not grant the court jurisdiction, a declaratory judgment in preimportation review falls within the court's residual jurisdiction under 28 U.S.C. § 1581(i) since the protest remedy is inadequate.

For the following reasons, the court holds that it has jurisdiction under § 1581(h), and thus, defendant's motion to dismiss is denied.

### DISCUSSION

The court's jurisdictional basis for preimportation judicial review of a ruling is 28 U.S.C. § 1581(h), reading:

**(h)** The Court of International Trade shall have exclusive jurisdiction of any civil action commenced to review, prior to the

importation of the goods involved, a ruling issued by the Secretary of the Treasury, or a refusal to issue or change such a ruling, relating to classification, valuation, rate of duty, *marking,* restricted merchandise, entry requirements, drawbacks, vessel repairs, or similar matters, *but only if the party commencing the civil action demonstrates to the court that he would be irreparably harmed unless given an opportunity to obtain judicial review prior to such importation.* [Emphasis added.]

H.R. Rep. No. 1235, 96th Cong., 2d Sess. 47, *reprinted in* 1980 U.S. Code Cong. & Adm. News 3729, 3758, explains the legislative intent in permitting preimportation judicial review:

[i]t is not the Committee's intent to permit judicial review prior to the completion of the import transaction in such a manner as to negate the traditional method of obtaining judicial review of import transactions. Such review, however, is exceptional and is authorized only when the requirements of subsection (h) are met.

Hence, it is clear that Congress manifested a preference for post-importation judicial review of Customs' rulings following the traditional channels of administrative protest (19 U.S.C. §§ 1514 and 1515),[1] and its intent that preimportation judicial review should be available only in exceptional cases and where the importer can demonstrate it would be irreparably harmed unless given an opportunity to obtain judicial review prior to importation. On the latter issue, as with jurisdiction generally, the plaintiff bears the burden of proof. *American Frozen Food Inst., Inc. v. United States,* 855 F. Supp. 388, 393 (1994); *National Juice Prods, Ass'n v. United States,* 628 F. Supp. 978, 982 (1986).

It is well established that "irreparable harm" within the purview of § 1581(h) is harm that cannot be redressed in a court of law. Essential to the inquiry into irreparable harm is the immediacy of the injury and inadequacy of future corrective relief. *American Frozen Food Inst., Inc.* and *National Juice Products Ass'n.* Where an importer demonstrates that compliance with a ruling of Customs regarding country of origin marking would cause the importer to incur costs, expenditures, business disruption or other financial losses, for which the importer has no legal redress to recover in court, even if the importer ultimately prevails on the merits in contesting the ruling, the importer suffers irreparable harm within the purview of § 1581(h). *National Juice; American Frozen Food Inst., Inc.; 718 Fifth Avenue Corp. v. United States,* 7 CIT 195 (1984); *Lois Jeans & Jackets, U.S.A., Inc. v. United States,* 566 F. Supp. 1523 (1983).

Specifically, in the context of a ruling of Customs concerning country of origin marking, irreparable harm may take, among others, the following forms: an importer's inability to immediately acquire new labels or packaging that comply with a ruling effective immediately; due to unavailability of labels or packaging complying with the ruling, the

---

[1] The traditional protest route—the filing and denial of a protest—forms the predicate for the exercise of this court's jurisdiction pursuant to 28 U.S.C. § 1581(a).

importer's inability to timely ship customer orders with consequential damage to customer confidence and relationships; expenses of redesigning new labels or packaging complying with the ruling; expenses of affixing new labels; loss and expense incident to storage or destruction of noncomplying labels and packaging in inventory; costs and expenditures for reengineering production methods or inventory control and tracking systems. *See e.g. National Juice; American Frozen Food Inst., Inc.; 718 Fifth Avenue Corp.; Lois Jeans.*

Plaintiff may, but need not, demonstrate that it would suffer multiple forms of irreparable harm. Moreover, "[w]hat is critical is not the magnitude of the injury, but rather its immediacy and the inadequacy of future corrective relief." *National Juice,* 628 F. Supp. at 984. However, in determining whether § 1581(h) jurisdiction should be invoked, the availability of viable inexpensive interim means for compliance with the ruling that would "reduce the impact of the change in labeling and substantially mitigate the damage" may be considered by the court. *National Juice,* 628 F. Supp. at 985–87, citing *Association of Food Industries, Inc. (Pistachio Group) v. von Raab,* 624 F. Supp. 1557 (1985) ("interim stickering" found not viable; "[i]n any case, even if adhesive stickers were physically possible to apply, plaintiffs could not recoup the significant costs of acquiring the equipment and stickers"). *See also Inner Secrets/Secretly Yours, Inc. v. United States,* 1995 WL 72429 (CIT, Feb. 1995) (failure to attempt mitigation detracts from importer's argument that it may be irreparably harmed).

Plaintiff strenuously maintains that if preimportation judicial review of the HRL were not granted, plaintiff would incur certain costs, expenses and losses, identified *infra,* that could not be recouped even if plaintiff were ultimately successful in contesting the ruling, and consequently plaintiff would suffer irreparable harm within the purview of the statute.

Defendant, on the other hand, vigorously disputes that the costs and expenses claimed by CPC constitute forms of harm contemplated by the statute, and contends that in any event, CPC has failed to even adequately document the harm claimed.

As documentation of the harm claimed by CPC resulting from the HRL, CPC has proffered an affidavit and a supplemental affidavit of Jerry Brennan, Business Director of the Best Foods Division of CPC, Englewood Cliffs, New Jersey. Brennan's duties cover food product packaging, labeling, and related oversight of technical regulatory compliance, including CPC's peanut butter produced in the United States in part of Canadian peanut slurry and sold at retail under the "Skippy" brand label.

The affidavits disclose:

1. CPC manufactures approximately 156,000,000 jars of peanut butter annually, of which approximately 140,000,000 are sold in the United States market. CPC sells several peanut butter products in a number of different sized retail packaging.

2. Since December 1992, CPC has periodically imported into the United States substantial quantities of Canadian-origin peanut slurry for use in the production of finished peanut butter products in the United States. To promote product uniformity, CPC blends Canadian peanut slurry with similar peanut slurry manufactured in the United States.

3. CPC imported and used 3.4 million pounds of Canadian peanut slurry for manufacturing peanut butter during 1994, projects importation of 3.1 million pounds of Canadian slurry for manufacturing peanut butter during 1995, and has secured a quota allocation for that amount. Based on CPC's historical maximum blend ratio of 18.4 percent Canadian slurry to 81.6 percent domestic slurry, this quantity of slurry would produce approximately 16.8 million pounds of finished Skippy peanut butter—enough to fill more than 44,000,000 6-ounce jars, or more than 22,000,000 12-ounce jars each year.

4. CPC achieves a substantial financial benefit from importing and using Canadian-origin slurry because it has a lower cost than domestic slurry. Canadian slurry is less expensive than domestic slurry because the imported slurry is made from peanuts costing about $0.30 per pound less than the peanuts used in the domestic slurry. Without importing very substantial quantities of Canadian origin slurry, CPC would lose this significant cost savings resulting in lower profits. Such higher cost and loss of profit from using solely domestic peanut slurry could not be recouped from the government in the event that plaintiff were successful in contesting the validity of the HRL.

5. CPC has designed, printed, and placed in inventory some twenty different labels covering its peanut butter products manufactured at several different geographical locations in the United States. Each label identifies and depicts the product and is printed with information showing the ingredients used in its manufacture, the company's name and address, a purchase date, net contents information, a UPC bar code and nutrition information required by the Nutrition Labeling and Education Act of 1990. CPC's current labels do not denote any foreign country of origin. The HRL requires CPC to print new labels bearing the words "Product of Canada."

6. To begin with, CPC would be required to make artwork and design changes for twenty different labels costing approximately $800.00 per label design change, resulting in a total cost of $16,000.00 for artwork and design changes.

7. CPC would incur significant printing costs for new labels. Printing of new labels incident to compliance with ruling would cost between $2.16 to $7.89 per 1000 labels, with an average cost of approximately $6.00 per 1000 labels for a portion of plaintiff's 144 million jars of peanut butter sold domestically each year. CPC would be especially impacted by again incurring redesign and printing costs for new labels as a result of the HRL inasmuch as CPC recently incurred such costs in order to com-

ply with the government's labeling requirements imposed by the Nutrition Labeling and Education Act of 1990.

8. Compliance with the ruling would additionally cause plaintiff to incur costs for production changes and special new inventory management methods, which in turn would increase CPC's working capital costs for label inventory and would double the number of stock keeping units of labeling inventory.

9. CPC would further incur substantial costs, which cannot now be quantified with accuracy, for inventory management in accordance with the methods specified in the Customs Regulations[2] or other methods. The "specific identification" inventory method, available under the Customs Regulations, would entail hundreds of thousands of dollars of added manufacturing costs annually and would diminish the company's productive capacity. Other prescribed inventory management methods, FIFO, LIFO, or averaging, would require CPC to design and implement new recordkeeping systems to comport with the applicable requirements and would result in added costs to CPC, that like all other costs and expenses incident to a newly instituted country of origin marking, would not be recouped by a favorable decision on the merits in preimportation judicial review.

10. Compliance with a new country of origin labeling requirement would cause an immediate disruption of plaintiff's sales. The HRL of October 25, 1994 was effective immediately. On that date, CPC had no labels on hand complying with the ruling and the lead time for obtaining new labels is approximately eight to ten weeks from the date the order for labels is placed. More, CPC would need time to modify its production system, as indicated above. Until new labels are obtained and production modified, CPC would be prevented from shipping peanut butter thereby suffering substantial lost sales, loss of customer confidence and lost profits.

11. The foregoing financial costs and losses incurred by CPC, including lost sales and production, cannot be recouped by CPC at a later time by increasing production and supply above customer need and demand, which are immediate and short term. Furthermore, even if CPC were ultimately to prevail in its contest of the validity of the HRL, the United States would have no legal obligation to compensate CPC for any monetary losses or additional costs or expenses CPC would incur in complying with the HRL.

12. There are no viable measures on even an interim basis for country of origin stickering that would not entail substantial costs for CPC. Whether CPC employed an automated adhesive method or manual

---

[2] 19 C.F.R. § 102.11(b)(2) provides: "If the material that imparts the essential character of the good is fungible, has been commingled, and direct physical identification of the origin of the commingled material is not practical, the country or countries of origin may be determined on the basis of the inventory management method provided under the Appendix to part 181 of the Customs Regulations." The inventory methods described in this appendix are the specific identification method, the FIFO (first in, first out) method, LIFO (last in, last out), and the average method. Prior to the HRL, CPC incurred no cost or expense for inventory management incident to country of origin. Significantly, defendant does not suggest any expense-free option that would be available to CPC.

application of second labels on an interim basis, thousands of man hours of labor for tens of millions of jars of peanut butter would cause CPC to incur very substantial unrecoupable costs.

Many of the costs and expenses above described in the Brennan affidavits appear to be very similar in form to those found by the court to constitute irreparable harm for purposes of preimportation judicial review under § 1581(h) in *National Juice* and *American Frozen Food Inst., Inc.*

Defendant, however, insists that those cases are distinguishable on their specific facts from the current case. For example, the court found interim stickering not feasible because adhesive labels would not adhere to the wet surface frozen food containers, which defendant maintains is not the case with jars of peanut butter for which interim stickering is feasible. Moreover, in *National Juice Products* the court found that plaintiffs could not forego importing foreign orange juice while conducting a test case because severe freezes had substantially diminished the availability of U.S. oranges, and product consistency could not be ensured without inclusion of foreign juice. 628 F. Supp. at 986. Here, according to defendant, CPC could import only a test shipment for purposes of filing a protest and use domestic supplies of peanut slurry. Finally, defendant claims that the two cases are distinguishable since in those cases plaintiffs would have incurred costs of redesign of its packages in conformance with Customs' ruling. *National Juice Products,* 628 F. Supp. at 978; *American Frozen Food Institute,* 855 F. Supp. at 394.

The court finds that defendant strains to distinguish *National Juice Products* and *American Frozen Food Institute* from the current case based on irrelevant factual distinctions while ignoring the court's rationale for finding irreparable harm in the context of country of origin marking and disregarding the undisputed facts of the current case. The types of harm demonstrated by the Brennan affidavits—significant costs, expenditures and losses that would be incurred in complying with the marking ruling—are virtually the identical forms of harm addressed in *American Frozen Food Institute* and *National Juice.*

Moreover, CPC has adequately demonstrated that it would incur irreparable harm even if it were to use interim adhesive stickers or rely solely on domestic supplies of peanut slurry during an administrative review of a protest. The Brennan affidavits demonstrate that if plaintiff were not to import substantial quantities of the Canadian slurry, during the period of non-importation, plaintiff would be required to incur the higher cost of the domestic slurry and loss of profit. Consequently, importing merely a test shipment of Canadian slurry simply to file a protest against its exclusion from entry,[3] as advocated by defendant, would

---

[3] Defendant notes that "as a result of the letter ruling, CPC will be required to certify at the time of filing the entry summary that the final product will be marked 'Product of Canada'." *See* 19 C.F.R. 134.26. The refusal of CPC to so certify will result in Customs excluding the merchandise [the slurry imported in bulk], which, as conceded by CPC, is protestable pursuant to 19 U.S.C. § 1514(a)(4)." Rely Brief at 12–13.

not obviate the negative financial impact of relying on the higher cost domestic supplies.

Further, defendant's insistence that CPC should be compelled to import a test shipment to precipitate a protestable seizure or exclusion of its merchandise for noncompliance with the ruling in order to obtain judicial review seems inconsistent with *Ross Cosmetics Distribution Centers, Inc. v. United States,* 17 CIT 814 (1993). In *Ross,* the court assumed jurisdiction under § 1581(h), without opposition by the government, to review a ruling by Customs determining that plaintiff's proposed labels and packages for imported cosmetic products constituted a counterfeit use of trademarks, and if the products were imported they would be subject to seizure. Hence, *Ross* was not required to follow the normal channels of importing and protest to contest Customs' trademark ruling where the goods would have been seized upon importation and excluded from entry. Indeed, as pointed out in *National Juice,* 628 F. Supp. at 984, noncompliance with the country of origin marking statute, 19 U.S.C. § 1304(g), could result in withholding of delivery until proper marking of the goods or until proper certifications are filed, with consequential severe business disruption. *See also Trayco, Inc. v. United States,* 994 F. 2d 832 (Fed. Cir. 1993).

With regard to defendant's claim that CPC failed to show that it could not mitigate its irreparable harm by use of interim adhesive stickers, CPC has convincingly demonstrated that even interim adhesive stickers would cause CPC to incur substantial costs of design, printing and high volume automated or manual application, as well as inventory tracking.

Insisting that the Brennan affidavits do not demonstrate the "type of harm" that is "sufficient" to confer jurisdiction on the court under § 1581(h), defendant calls attention to *Thyssen Steel Co. v. United States,* 712 F. Supp. 202 (CIT 1989); 718 *Fifth Avenue Corp. v. United States,* 7 CIT 195 (1984); *Arbor Foods, Inc v. United States,* 600 F. Supp. 217 (CIT 1984); and *Manufacture de Machines v. Von Raab,* 569 F. Supp. 877 (CIT 1983). The foregoing cases held that plaintiffs did not demonstrate irreparable harm, but each case presents particular circumstances and types of harm readily distinguishable from those demonstrated by CPC.

In *Thyssen Steel,* the court found that the consequences of simply a reclassification of merchandise subjecting the importer's merchandise to voluntary restraint arrangements—possible exclusion from entry (with consequential lost profits, lost good will and tarnished good name)—is not the type of harm contemplated by § 1581(h).

*Manufacture de Machines,* 569 F. Supp. at 881, holds that irreparable harm may not be predicated on the consequences of possible exclusion of merchandise from entry based on trademark infringement—lost profits, lost opportunities to make agreements for sale of its product, lost good will and tarnished good name.

In *718 Fifth Avenue,* the importer received an unfavorable ruling from Customs that plaintiff would not be entitled to drawback of duty by

reimporting and then timely exporting certain merchandise simply for the purpose of making a drawback claim. Plaintiff then filed suit under § 1581(h) seeking a preimportation declaratory judgment that Customs' drawback ruling was erroneous. In rejecting plaintiff's claim of irreparable harm and thus jurisdiction under § 1581(h), the court held that plaintiff had an adequate remedy for contesting the ruling by protest after importation upon denial of an application for drawback. Citing *United States v. Uniroyal, Inc.,* 69 CCPA 179, 687 F.2d 467 (1982), the *718 Fifth Avenue* court aptly observed: "The importer would only have to allege that the Customs Service had ruled against it and the unfavorable ruling would make it unlikely that the importer could obtain the desired result *[viz.,* a drawback] when the import transaction was attempted." Accordingly, *718 Fifth Avenue* precludes a finding of irreparable harm based simply on the fact that Customs has ruled against the importer's position and may adhere to its ruling after importation. Again, that is not the situation here.

*Arbor Foods, Inc.* rules that the court will not find irreparable harm for purposes of preliminary injunction from lost sales and profits, lost benefits from past marketing efforts, damage to reputation, which the court determines to be highly speculative.

Hence, the types of harm involved in the above-cited cases relied on by defendant—*none of which involved potential costs and expenses for compliance with a ruling requiring country of origin marking*—are totally inapposite to the circumstances here.

Citing *Thyssen, 718 Fifth Avenue, Inner Secrets/Secretly Yours, Inc. v. United States,* 1995 W.L. 72429 (CIT Feb. 14, 1995), and *Ass'n of Food Indus., Inc. v. Von Raab,* 624 F. Supp. 1557 (1985), defendant also argues that even assuming *arguendo* that the Brennan affidavits described the type of harm encompassed by § 1581(h), CPC has nonetheless failed to "document" numerically the extent of the harm that would be incurred by plaintiff, and in any event, plaintiff failed to demonstrate that the ruling posed a sufficient threat to CPC's ability to continue operating as a profitable business.

Defendant's contention that CPC failed to adequately document irreparable harm is squarely refuted by *National Juice and American Frozen Food Institute; supra.* Significantly, in both cases the court accepted as adequate proof of irreparable harm estimates and projected possible costs and losses that would be incident to meeting Customs' country of origin marking requirements. As previously noted, the magnitude of the harm, while relevant to whether preimportation review may be justified, is not critical. *See National Juice,* 628 F. Supp. at 984.

In *American Frozen Food Institute,* the court found acceptable as proof of irreparable harm affidavit evidence that "[p]laintiffs * * * *will* lose substantial sums of money from the destruction of stockpiled noncomplying labeling"; that "costs for labelling redesign * * * were *projected* at *over* $9 million"; that "costs to destroy labels and its printing costs to change labels *would be in excess of* $900,000"; that *"estimated*

*costs* additionally reflect that in many instances * * * plaintiff *would be* required to design and order multiple packages for one product"; and that "it *would be* necessary to reengineer its inventory management process." *Id.* at 393–94 (emphasis added).

In *National Juice,* the court received: *affidavit evidence* of packaging suppliers that they *will be* unable to timely provide the necessary labels and cans, and *estimating* that the transition to packaging complying with the new ruling would consume a year to two and one-half years; evidence that inability to immediately comply with the new ruling would result in the inability to fill orders placed by retail customers; documentation of the *possibility* of *significant* disruption of plaintiffs' business operations that would result if plaintiffs were required to comply with the ruling.

*See also Lois Jeans & Jackets, U.S.A., Inc. v. United States,* 566 F. Supp. 1523, 1527 (1983) wherein this court accepted as adequate proof of irreparable harm to enjoin redelivery notices issued under ruling unrebutted affidavit evidence and oral testimony establishing *inter alia,* prospect for loss of future sales and orders, injury to plaintiff's reputation as a reliable supplier, potential costs *(which could not be precisely quantified)* required to alter plaintiff's production methods, and other actual and potential injuries.

In sum, the undisputed Brennan affidavits adequately document the forms of harm claimed by CPC and demonstrate irreparable harm within the purview of the statute.

Finally, in opposing preimportion judicial review, defendant cites *718 Fifth Avenue,* arguing that CPC's approximately three month delay after the HRL to commence this lawsuit undercuts its claim of irreparable harm. Under the circumstances of this case, the court finds the government's delay argument misplaced.

Unquestionably, delay by an importer in seeking preimportation judicial review is a relevant factor in determining whether denial of such review would result in irreparable harm to the importer. Obviously, an importer's claim that it would be irreparably harmed by being required to utilize the normal protest channel or review as a prerequisite to judicial review is undercut by unreasonable delay in commencing a lawsuit seeking judicial review under § 1581(h).

In *718 Fifth Avenue,* preimportation review under § 1581(h) was denied by the court for failure to demonstrate irreparable harm, citing among other reasons that the importer had delayed filing suit for approximately nine months after the issuance of an adverse drawback ruling by Customs.

The court does not regard *718 Fifth Avenue* controlling here. CPC's little more than three months delay before filing suit was hardly an unreasonable time for plaintiff to make a responsible investigation and assessment of the projected costs and expenses that would be incident to compliance with the country of origin ruling, obtain advice of counsel, and weigh its options.

CONCLUSION

In view of the foregoing, the court need not reach plaintiff's alternative basis for jurisdiction under § 1581(i). CPC has appropriately invoked this court's jurisdiction over preimportation declaratory judgments in compliance with § 1581(h). Defendant's motion to dismiss is denied.

Finally, the court finds that the parties' exhaustive briefing and analysis of the relevant legal issues and precedents adequately present their positions, and in view of the decision reached herein and in the interest of judicial economy, plaintiff's consent motion for oral argument is denied.